GLADNEY'S, Inc., v. LOUISIANA
MAGAZINE et al. .

No. 1371.

Court of Appeal of Louisiana, First Circuit.
Oct. 3, 1934.

Fred. G. Benton, of Baton Rouge, for appellant.

C. C. Bird, Jr., of Baton Rouge, for appellees.

LE BLANC, Judge.

The Louisiana Chamber of Commerce, a purely civic association devoted to the advancement of the industrial, commercial, and agricultural welfare of the state of Louisiana, published as its official organ a magazine called "Louisiana." Prior to January, 1930, Herbert Bayliss who was the general manager of the association, appears to have been the publisher of the magazine, but on January 13, 1930, there was an agreement entered into between himself, representing the association as its manager, and one Matthew J. O'Neil, under which the latter was given the exclusive right of publication under certain terms and conditions therein fully set out.

After this contract with O'Neil had been entered into, the services of the plaintiff herein, as printers, were secured to print the magazine, and the May, 1930, and a special issue in August of that same year were gotten out, for which plaintiff rendered bills in due time, addressed to "Louisiana Magazine, Mr. M. J. O'Neil, Business Manager, Baton Rouge, La." The bills, aggregating the sum of $1,377, were never paid, and this suit was instituted as a result thereof.

The suit is directed against the Louisiana Chamber of Commerce, Herbert Bayliss, and

the Louisiana Magazine, the latter alleged to have been a commercial partnership composed of Harley A. W. Howcott and Matthew J. O'Neil, and judgment is asked for against all of these defendants in solido.

In its petition, plaintiff alleges that, in consummating the contract of January 13, 1930, O'Neil was acting for an undisclosed partnership (that just referred to) created for the purpose of publishing and circulating the magazine, for buying and selling advertising space therein, and generally to carry out the terms of the contract he had entered into with the Louisiana Chamber of Commerce. The petition then sets out certain acts performed by Harley A. W. Howcott which definitely identified him as O'Neil's partner. It is further alleged that, whether the contract of January 13, 1930, was originally intended for the benefit of the undisclosed partnership or not, or was thereafter assigned to it, the members of the said partnership, in assuming the obligations thereunder and in receiving and appropriating its benefits, are estopped from denying such obligations, and particularly the one herein sued on.

Shortly after the filing of the suit, Harley A. W. Howcott died, and his heirs, Harley B. Howcott and Miss Mary Howcott, were made parties defendant in his stead. O'Neil, it appears, has entirely disappeared from the scene, his whereabouts being unknown. The other defendants apparently have been dropped from the proceeding, and the contest is now narrowed down to one between plaintiff and the two heirs of Mr. Howcott. The defense of these two is a denial of the alleged partnership between their late father and O'Neil and a denial of any act or conduct on his part which may have constituted a partnership by estoppel.

From a judgment rejecting its demand, the plaintiff has taken this appeal.

It may be appropriate at this time to state that, in a supplemental petition, plaintiff made allegations, in the alternative, to the effect that, irrespective of the existence of the partnership as set out in its original petition, Harley A. W. Howcott was personally and individually interested in the operation of the business he had designated "Louisiana Magazine," and the contract entered into in the name of O'Neil was in truth and in fact made for his personal and individual account, and all obligations contracted by the business were his personal obligations for which he was individually responsible. Claiming that the allegations of this supplemental petition were inconsistent with those

of an undisclosed partnership as set out in the original petition, defendants filed a motion to have the court order plaintiff to elect on which it would stand in prosecuting its claim against them. The court sustained the motion to elect, and plaintiff chose to stand upon its allegations of partnership. Counsel for plaintiff reserved a bill, and in this court complains of the ruling.

■ We are of the opinion that counsel's complaint is well founded. While the legal conclusion reached, as appears by the demand in the respective petitions, is different, they are both more or less based on the same state of facts. Whether the obligations incurred under, and the benefits derived from, the contract, related to Harley A. W. Howcott personally from his individual connection therewith or as a result of the alleged partnership, the result would be the same, under the theory advanced by the plaintiff. Besides, the demand in the supplemental petition is made in the alternative. We think that the language of the Supreme Court in the case of Dilzell Engineering & Construction Co., Ltd., v. Lehmann, 120 La. 273, 45 So. 138, is appropriate to the situation that is here presented. We quote the following excerpts from the body of page 279 of 120 La., 45 So. 138, 140:

"Nor is the exception of inconsistency better founded. The petition does no more than draw alternative legal conclusions from certain facts that are stated, and we can see no objection to this being done. It is no more than doing in one suit what might be done in two. * * *

"Cases might arise where joining two alternative demands in one petition, instead of urging them by separate suits, might cause complications, or confusion, or useless expense or delay; but in a case like the present, where the parties and the facts are the same on both demands, and the alternative theories are resorted to merely for the purpose of adapting the demand to the view which the court may take of the matter, we see no reason why the litigation should not be settled in one suit. * * * "

■ Under its ruling on the motion to elect, the lower court necessarily restricted the testimony to the question of the alleged partnership and, ordinarily, a reversal of the ruling might require a remand of the case to admit testimony on the alternative demand. Counsel for plaintiff has stated in his brief, however, that he feels that the evidence submitted shows the personal interest of Harley A. W. Howcott in the enterprise and his individual assumption of the debt sued on, and

it is therefore unnecessary to order a remand. Taking our cue from counsel's statement, we now proceed to consider and decide the case on the merits as though all available testimony were in the record.

■ There are two issues presented, involving mainly questions of fact, on both of which the plaintiff carried the burden of proof: First, did a commercial partnership composed of Harley A. W. Howcott and Matthew J. O'Neil exist as a fact for the purposes set out in plaintiff's petition, and did that partnership carry out these purposes? And, second, if there was no such partnership existing as a fact, did Harley A. W. Howcott hold himself out to the public, and especially to the plaintiff herein, and did he by his actions and conduct lead them to believe that he was a partner in the business to the extent that he may have obligated himself for any of its undertakings? We think that the issue of Howcott's personal and individual responsibility which is raised by the plaintiff's supplemental petition, as an alternative proposition, is so closely connected with the question of estoppel that is raised under the second issue just enumerated that they can be considered together.

■ On January 9, 1930, there was an account opened with the Citizens' Bank & Trust Co., in Baton Rouge, in the name of "Louisiana Magazine." The deposit consisted of the proceeds of a check in the sum of $1,000 drawn by Harley A. W. Howcott on the Hibernia Bank & Trust Company of New Orleans, payable to the order of Louisiana Magazine. The check bears the indorsement "Louisiana Magazine by M. J. O'Neil." A signature card authorizing the withdrawal of the funds was that day signed by both M. J. O'Neil and Harley A. W. Howcott, and this may be said to constitute the first link in the chain of evidence to prove the partnership alleged to have existed between these parties.

Mr. C. M. Downs, formerly president of the Citizens' Bank & Trust Company, testifies that the opening of the account was handled by himself; that both Mr. O'Neil and Mr. Howcott dealt with him in matters pertaining to it; but that his relations in reference thereto were mostly with O'Neil. The account was active only for a period of six months. When asked if Mr. Howcott ever discussed anything with him except the making of the deposit, he answers that he told him that he and O'Neil were going to publish the magazine, and went into details about it, but he did not remember what these details were. Mr. Down's testimony is of so general a nature that it bears no convincing force as proof of any partnership agreement between the two parties. The most imposing bit of evidence in connection with this bank transaction is the signature card itself which bears their joint signatures. That evidence alone, however, is not sufficient to show the existence of a partnership in fact, especially when the circumstances under which the deposit was so made are fully explained by the testimony of another witness who was familiar with the whole matter. This witness is Mr. James L. Helm, attorney at law, who formerly resided and practised his profession in Baton Rouge, but is now a resident and attorney of New Iberia. Mr. Helm was at the time, O'Neil's attorney, and advised him with reference to the contract he entered into with the Louisiana Chamber of Commerce on January 13, 1930, relative to the publishing of the magazine "Louisiana." He prepared the contract, which was finally signed, and was paid a fee for his services by O'Neil. Helm testified that both O'Neil and Howcott explained to him that the latter had agreed to lend O'Neil enough money with which to go into the business, and that in fact he was asked by Mr. Howcott how best to secure such loan. He knew that the only security O'Neil could give was his open note, and he so told Howcott. This seemed satisfactory to the latter, but, later on, they both told him that they had made a different arrangement which contemplated the placing of the proceeds of the loan to their joint account in the bank, where, in the event anything should happen to O'Neil, Howcott would have no trouble in withdrawing the balance remaining in the account, and that, for the amount he could not thus secure, he would take O'Neil's notes. It is apparent that the $1,000 deposit represented the amount of money so loaned by Howcott, and that it was placed in the bank under the agreement which he and O'Neil had entered into.

■ As another piece of evidence which it is contended indicates the existence of a partnership, plaintiff's counsel points to the fact that Howcott and O'Neil occupied the same office in the Kernan building on Florida street in Baton Rouge, and that the window signs carried the name of "Louisiana Magazine, M. J. O'Neil, Manager," as well as that of Mr. Howcott, whose principal business, it appears, was real estate. That sign of itself, was of course not enough to connect Mr. Howcott as O'Neil's partner, and, besides, there is other testimony to show that Howcott permitted O'Neil to occupy space in his office, free of rent, in return for a free advertisement of his

real estate business in the "Louisiana" magazine.

Mr. R. Paul Green, who was at one time employed by the Louisiana Chamber of Commerce in the capacity of part-time clerk and statistician, compiling data that was used for articles appearing in the magazine, testifies about frequent conversations he had with Mr. Howcott with reference to the magazine, how interested he was in it, and what an optimistic feeling he entertained regarding its future. All of that may be very true, but it in no way establishes the fact of the existence of a partnership between Howcott and O'Neil having for its purpose the publication of the magazine.

Miss Clara M. Hatcher, formerly associated with Mr. Howcott as a saleslady in his real estate business, and who now lives in Conroe, Tex., testified by deposition. Her testimony is to the effect that Mr. Howcott was the publisher of the magazine, and that O'Neil was the general manager under his direction. Whilst it may have some bearing on the issue of Howcott's personal liability, her testimony seems rather to discard plaintiff's main theory, which was that of liability as a partner.

The facts produced to prove a partnership in fact are no stronger, and some of them not as persuasive, as were those in the case of Robertson v. Cambon, 176 La. 753, 146 So. 738, in which the court held that the plaintiff had not shown that there was a partnership as contended by him existing between the defendant and his brothers as a member of which he was sought to be held liable for one of its debts. We conclude, therefore, that there was no partnership between O'Neil and Howcott, and that, if the latter is to be held liable for the claim sued on, it is only on the theory that he, by his statements or conduct, led plaintiff to believe that he was a partner and interested in the business of publishing the magazine, or else that he made himself personally and directly responsible.

"The liability, as a partner, of a person who holds himself out as a partner, * '* * is predicated on the doctrine of estoppel." Ruling Case Law, vol. 20, p. 1068, par. 312. It is a well-recognized principle in the law of estoppel that he who pleads it must show that he was induced either by some statement or action on the part of the one against whom he urges it to follow a course of action which he would not have followed otherwise, and that he did so to his detriment. None of the statements or actions of Mr. Howcott so far mentioned herein could have misled any one into the belief that he was asso-

ciated with O'Neil, as a partner, in publishing this magazine, and we are left to consider in this connection only the statements attributed to him by Mr. W. Frank Gladney, president and general manager of the plaintiff corporation. Mr. Gladney testifies about certain acts of Mr. Howcott and regarding several conversations he had with him in which he manifested his interest in the magazine to such an extent that it would be reasonable for him to have accepted it as a fact that he was personally and directly interested in its publication and that he extended credit to the partnership, relying on Howcott's conduct in the matter. But the force of Mr. Gladney's testimony in this respect is greatly weakened by his refusal to deny that in June, 1930, he had had a conversation with Mr. Howcott, in the presence of Mr. James L. Helm, in the course of which Mr. Howcott told him specifically that he was not interested in the Louisiana Magazine, but had merely loaned money to O'Neil for its publication. Neither would Mr. Gladney deny that on the same occasion he impliedly acquiesced in this as a fact as he thanked Mr. Howcott for his information and told him that he would handle the matter with O'Neil. After being put on guard and when pressed for a specific denial, Mr. Gladney's answer to questions regarding this conversation is that he "does not remember" it. Mr. Helm's testimony however, coupled with Mr. Gladney's failure to deny it, leaves but little doubt that such conversation had taken place, and its effect was to fully satisfy Mr. Gladney that Mr. Howcott was not connected with O'Neil in the publication of the magazine in any way other than having loaned him money to start the business. Helm testified further that, after Mr. Gladney left, Mr. Howcott remarked that he could not understand Gladney's coming to him with O'Neil's invoices, as he had repeatedly told him that he had nothing to do with the magazine. This remark indicates that, even prior to the conversation of June, 1930, Mr. Gladney had been made aware of the real situation and could hardly have been misled by any remarks made to him by Mr. Howcott on which he extended the credit which forms the basis of the claims that are here being prosecuted.

Miss Hatcher's testimony goes further than that of any other witness in an attempt to make it appear that Mr. Howcott was individually responsible, as she is the only one who testifies that he was really the publisher of the magazine and that O'Neil was only his business manager. Her statement to that effect, unsupported as it is, is not sufficient to

bind the present defendants for the obligation herein sued on. Besides, we note in Mr. Helm's testimony that some time in October, 1930, after this suit had been filed, and again on another occasion when Miss Hatcher consulted him with regard to a claim she wanted him to collect from Mr. Howcott's heirs, she told him that she knew absolutely nothing about the arrangements concerning the publication of the Louisiana Magazine, nor about any circumstances pertaining to this suit.

█ We are of the opinion that plaintiff has failed to sustain any of the contentions presented by the pleadings and on·which it has endeavored to fix liability on these defendants. The judgment of the lower court properly rejected the demand, and it is therefore affirmed.